**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| A. SCHULMAN, INC., | ) | |
| | ) | |
| Plaintiff and Counter-Defendant, | ) | Case No. 1:15 CV 1760 |
| | ) | |
| v. | ) | Judge Patricia A. Gaughan |
| | ) | |
| POLYONE CORPORATION and | ) | |
| POLYONE DESIGNED STRUCTURES | ) | |
| AND SOLUTIONS LLC | ) | |
| | ) | |
| Defendants and Counter-Plaintiffs. | ) | |
| | ) | |

**POLYONE CORPORATION'S AND POLYONE DESIGNED STRUCTURES AND
SOLUTION LLC'S L.P.R. 4.4(b) RESPONSIVE CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.     Introduction ................................................................................................................ 1

II.    ASI's Reliance on Extrinsic References Cannot Save the Claims from
       Indefiniteness ............................................................................................................ 2

       A.     Without Intrinsic Evidence, ASI Tries to Backfill with Extrinsic
              Statements from Experts ................................................................................. 2

              1.     ASI's Expert Declarations Are Unsupported Conclusions ........................ 2

              2.     The Declaration of Inventor Dennis is Not Evidence ............................... 5

       B.     ASI's Reexamination Arguments Cannot Support Claim Construction ............... 6

III.   ASI's Gravelometer Arguments are Unworkable Because the Claimed Structures
       Do Not Have Paint to Chip Off .................................................................................... 9

       A.     ASI's Proposed Gravelometer Construction Would Render the Claims
              Meaningless ................................................................................................... 9

       B.     ASI's Proposed Gravelometer Construction Does Not Explain What a
              "Chip" is for Plastics ...................................................................................... 11

       C.     ASI's Proposed Gravelometer Construction Improperly Asserts "Common
              Sense" for Administering the Modified GM9508P Test ..................................... 13

       D.     To the Extent the Gravelometer Limitation Can Be Construed, All
              Damage Should Be Counted ........................................................................... 14

IV.    ASI's DOI Construction Improperly Redrafts the Asserted Patents ............................... 16

       A.     The GM4348M Standard is Not Intrinsic Evidence ........................................... 17

       B.     The GM4348M Standard is Not Related to a Gravelometer Test ......................... 19

       C.     The GM4348M Standard Was Never Identified As Prior Art ............................... 20

V.     ASI's Random Microstructure Construction Relies Entirely on Unreliable
       Extrinsic Reference ..................................................................................................... 20

VI.    ASI's Colored and Clear Constructions Result in an Impermissible Overlap ................. 23

VII.   Conclusion ................................................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.,*
    637 F.3d 1324 (Fed. Cir. 2011)..........................................................7

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.,*
    709 F.3d 1348 (Fed. Cir. 2013)..........................................................4

*Bell & Howell Document Mgmt. Prod. Co. v. Altek Sys.,*
    132 F.3d 701 (Fed. Cir. 1997)............................................................5

*Cat Tech LLC v. TubeMaster, Inc.,*
    528 F.3d 871 (Fed. Cir. 2008)..........................................................10

*Caterpillar Tractor Co. v. Berco, S.P.A.,*
    714 F.2d 1110 (Fed. Cir. 1983)..........................................................8

*CVI/Beta Ventures, Inc. v. Tura LP,*
    112 F.3d 1146 (Fed. Cir. 1997)..........................................................7

*Cybor Corp. v. FAS Techs., Inc.,*
    138 F.3d 1448 (Fed. Cir. 1998)..........................................................8

*Datamize, LLC v. Plumtree Software, Inc.,*
    417 F.3d 1342 (Fed. Cir. 2005)........................................................18

*Dow Chem. Co. v. Nova Chem. Corp. (Can.),*
    803 F.3d 620 (Fed. Cir. 2015)....................................................14, 17

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,*
    114 F.3d 1547 (Fed. Cir. 1997)..........................................................7

*Ekchian v. Home Depot, Inc.,*
    104 F.3d 1299 (Fed. Cir. 1997)........................................................20

*Hockerson–Halberstadt, Inc. v. Converse Inc.,*
    183 F.3d 1369 (Fed.Cir.1999)..........................................................10

*Honeywell Int'l, Inc. v. ITT Indus., Inc.,*
    452 F.3d 1312 (Fed. Cir. 2006)..........................................................7

*Interval Licensing LLC v. AOL, Inc.,*
    766 F.3d 1364 (Fed. Cir. 2014)....................................................1, 24

*Krippelz v. Ford Motor Co.*,
   667 F.3d 1261 (Fed. Cir. 2012).................................................................... 7

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
   545 F.3d 1340 (Fed. Cir. 2008).................................................................. 10

*Liberty Ammunition, Inc. v. United States*,
   835 F.3d 1388 (Fed. Cir. 2016).................................................................. 11

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995)....................................................................... 6

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996).................................................................................... 1

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
   357 F.3d 1340 (Fed. Cir. 2004).................................................................. 19

*Nautilus Inc. v. Biosig Instruments, Inc.*,
   134 S.Ct. 2120 (2014)......................................................................... passim

*Pall Corp. v. PTI Techs. Inc.*,
   259 F.3d 1383 (Fed. Cir. 2001).................................................................. 20

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)........................................................ 2, 3, 4, 14

*Regeneron Pharms., Inc. v. Merus B.V.*,
   No. 14 CIV. 1650 KBF, 2014 WL 6611510 (S.D.N.Y. Nov. 21, 2014) ......................... 21

*Solomon v. Kimberly-Clark Corp.*,
   216 F.3d 1372 (Fed. Cir. 2000).................................................................... 6

*Warner-Jenkinson Co. v. Allied Chem. Corp.*,
   477 F. Supp. 371 (S.D.N.Y. 1979).................................................................. 8

**Statutes**

35 USC § 112 .............................................................................. 1, 6, 18, 21

**Other Authorities**

MPEP §2209 ........................................................................................ 8

## I.    Introduction

Plaintiff's opening brief spends its time trying to explain away the gaps in its patents with extrinsic references rather than construing the claims with intrinsic evidence.  None of these litigation-created explanations, however, informs the public about the scope of the Asserted Patents.  The patent claims are, in fact, moving targets that vary in scope depending on which test protocols are used in an attempt to determine infringement.

The Supreme Court in *Nautilus Inc. v. Biosig Instruments, Inc.* reiterated that the monopoly right granted to inventors by Congress "is a property right, and like any property right, its boundaries should be clear."  134 S.Ct. 2120, 2124 (2014) (citations omitted).  The claims must inform those skilled in the art what the scope of the invention is with reasonable certainty thereby affording clear notice of what is claimed and apprising the public what is still open to them.  *Nautilus*, 134 S.Ct. at 2129 (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996)).  If the claims do not do so, they are indefinite and invalid.  *See, Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (affirming invalidity of certain claims in view of District Court's determination during claim construction that the claims were indefinite under 35 U.S.C. § 112, ¶2).

There is no reasonable certainty to the scope of the Plaintiff's patent claims.  Realizing this, Plaintiff's brief tries to cover up its mistakes by backfilling new information into its patents.  This late information does not help.  There is no explanation as to how to use the GM9508P paint test on the claimed plastic parts.  And there is no indication which of the many DOI tests or instruments to use.  As a result, neither the public nor the Defendants have clear notice with what is claimed and what is still open to the public to freely use.

## II. ASI's Reliance on Extrinsic References Cannot Save the Claims from Indefiniteness

### A. Without Intrinsic Evidence, ASI Tries to Backfill with Extrinsic Statements from Experts

When interpreting claim language, courts first consult the intrinsic record, which includes the specification and prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315-17 (Fed. Cir. 2005). ASI, however, skips this step and jumps right to its extrinsic expert statements.[1] But "while extrinsic evidence can shed useful light on the relevant art, [the Federal Circuit] has explained that it is less significant than the intrinsic record [the patent and its prosecution history] in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (internal citations and quotations omitted).

The Federal Circuit has explained that "expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field. However, conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Phillips*, 415 F.3d at 1318 (internal citations omitted).

#### 1. ASI's Expert Declarations Are Unsupported Conclusions

ASI relies heavily on its experts. This is "less reliable… [because] expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from

---

[1] ASI tries to create issues that do not exist by listing a supposed dispute of the definition of a person of ordinary skill in the art. (ASI's Opening Claim Construction Brief at 8-9, ECF No. 58) ("ASI Br."). This is misdirection as the parties do not dispute this definition for the purposes of claim construction. PolyOne's Experts are also each qualified to testify on this subject matter. Dr. Cynthia Gosselin holds a B.S. in Materials Engineering, and an M.S., and PhD in Materials Science. (Decl. of Dr. Cynthia Gosselin, Ex. 1, ¶ 1, ECF No. 62 (the "Gosselin Decl.")). Dr. Todd Menna also holds an undergraduate and graduate degree is material science. (Decl. of Dr. Todd Menna, Ex. 1, ¶ 1, ECF No. 63 (the "Menna Decl.")).

2

bias that is not present in intrinsic evidence.  The effect of that bias can be exacerbated if the expert is not one of skill in the relevant art or if the expert's opinion is offered in a form that is not subject to cross-examination."  *Phillips*, 415 F.3d at 1318.

Both of ASI's experts—Dr. Baghdachi and Dr. Coughlin—conclude but do not analyze. Dr. Baghdachi's declaration (Decl. of Jamil Baghdachi, PhD, ECF No. 58-2 ("PX 2")) regarding the DOI and Gravelometer limitations includes the exact type of "bias" warned about by *Phillips*. Dr. Baghdachi provides background (PX2 at ¶¶1-7, 10-11 and 13, ECF No. 58-2) and a summary of the Asserted Patents (PX2 at ¶¶8-9 and 15, ECF No. 58-2).  With little more, however, he jumps to his conclusion which parrots ASI's proposed construction.  He simply declares that "[b]ased on my experience, a POSA would look to the GM4348M to determine the instruments to use to measure DOI in order to qualify for GM."  (PX 2 at ¶12, ECF No. 58-2).

Dr. Bachdachi's conclusion leaves the "why" questions unanswered.  Why would a person of ordinary skill select the GM4348M standard to test for DOI rather than the other governing DOI testing protocols and DOI instruments that existed at the time of the invention? (*See* Gosselin Decl., Ex. B, ¶8, ECF No. 62-2; *See, e.g.* Michalek Decl., Ex. 8, ECF No. 61).  Or why would one choose the GM4348M standard rather than a different *automotive* standard from Chrysler, Ford Motor Company, Honda Motor Company, Mitsubishi, Nissan, Toyota or Mazda that were available at the time?[2]  He even fails to explain whether each of the four (4) DOI instruments identified in GM4348M would lead to the same or similar results.[3]  Dr. Baghdachi's conclusion fatally ignores these important questions and analysis.  *See Aristocrat Techs. Austl.*

---

[2] ASI's Brief argues that a GM4348M is essential to performing the GM9508P test and therefore should be used to calculate DOI.  (ASI Br. at 15, ECF No. 58).  Dr. Baghdachi provides no support regarding this attorney argument.
[3] PolyOne's expert Dr. Gosselin explains that each of the 4 instruments are different and can lead to different results.  (Gosselin Decl., Ex. B, ¶24, ECF No. 62-2).

*Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1361 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1318) ("By failing to explain why a person of ordinary skill in the art would understand 'making a wager' to describe the steps performed by the microprocessor in processing the bet, Crevelt failed to support his assertion that 'making a wager,' as understood by a person of ordinary skill in art, 'means transfer of credits from the credit meter to the bet meter by the game software.'").

Similarly, with respect to the Gravelometer limitation, Dr. Baghdachi merely states: "From Table 2, I would conclude that a person of ordinary skill in the art as of May 5, 2008 would have concluded that to pass the gravelometer test recited in the claims of the '902 patent, the sample would need a score of 7 or greater with no delamination or cracking." (PX 2 at ¶16, ECF No. 58-2).  But there is no analysis of how or why a person of ordinary skill in the art would apply the GM9508P paint test to the claimed plastics.  Dr. Baghdachi's declaration, filled with mere conclusions, is exactly the "unsupported" expert declaration that is "not useful to a court."  *See Phillips*, 415 F.3d at 1318 (internal citations omitted).

Dr. Coughlin's declaration for the "clear," "colored" and "random microstructure" limitations is similarly flawed.  (Decl. of E. Bryan Coughlin, Ph.D., ECF No. 58-1 ("PX 1")).  In paragraphs 1-11, Dr. Coughlin simply recites background education and patent information.  Paragraphs 13-14 are just a naked listing of ASI's claim construction for the "clear" and "colored."  No expert analysis is present.

With respect to the random microstructure, Dr. Coughlin's paragraph 12 identifies extrinsic publications[4] and concludes without analysis:

> "Based on this publication, in my opinion a POSA would understand that a polyolefin backing layer with a 'random microstructure' is a layer primarily composing one or more polyolefins that are not block copolymers, and in which the mer units (the portion of a polymer derived from a single reactant molecule) do not form blocks and, instead, are incorporated in an essentially non-repeating manner."  (PX 1 at ¶12, ECF No. 58-1).

The '622 publication is a different technology than the Asserted Patents.  It is for rubber tires; not plastic parts.  ('622 Publication at ¶ [0025] ("Random microstructure can provide particular benefit in certain end use applications such as, e.g., rubber compositions used in the manufacture of tire treads.")).  Again, this is another conclusion that is unsupported by any intrinsic evidence.  *See Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997) ("Patents should be interpreted on the basis of their intrinsic record, not on the testimony of such after-the-fact 'experts' that played no part in the creation and prosecution of the patent.").

### 2.    The Declaration of Inventor Dennis is Not Evidence

ASI's use of its inventor, Dennis Smith, is also unreliable.[5]  (ASI Br. at 19, ECF No. 58). Mr. Smith is not an expert, yet ASI leans on him anyway.  The Federal Circuit has explained that "[t]he testimony of an inventor and his attorney concerning claim construction is thus entitled to little or no consideration. The testimony of an inventor often is a self-serving, after-the-fact attempt to state what should have been part of his or her patent application…"  *Bell & Howell*

---

[4] Dr. Coughlin identifies U.S. Publication No. 2007/0293622 (the "'622 publication") and an article entitled "Block Index for Characterizing Olefin Block Copolymers."  (PX 2 at ¶12, ECF No. 58-2).  None of these references are part of the intrinsic evidence.  In fact, none of these references were cited by ASI in information disclosure statements as prior art or even being relevant during prosecution of either the '902 or '906 patents.

[5] ASI's brief includes a footnote to Dennis Smith's declaration as "Cite."  Ostensibly a typographical error, it appears ASI was attempting to refer to Dennis Smith's declaration filed during in 2015 during the prosecution of the reexaminations.

*Document Mgmt. Prod. Co.*, 132 F.3d at 706 (citing *Markman v. Westview Instruments*, *Inc.* 52 F.3d 967, 983 (Fed. Cir. 1995)).  Indeed, in the context of indefiniteness situations, "[i]t is particularly inappropriate to consider inventor testimony obtained in the context of litigation in assessing validity under section 112, paragraph 2, in view of the absence of probative value of such testimony."  *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1379 (Fed. Cir. 2000).

### B.      ASI's Reexamination Arguments Cannot Support Claim Construction

ASI tries to *create* intrinsic evidence through statements made during the Reexaminations.  (*See, e.g.* ASI Br. at 19, ECF No. 58).  But the Asserted Patents' priority date is May 5, 2008 (JX1, JA000001; JX2, JA000021[6]) and the Reexamination statements were made much later in 2015 and 2016.  (JX5-7).  If the Accused Patents are invalid, they cannot be fixed seven (7) years later.

ASI calls its Reexamination statements "intrinsic."  (ASI Br. at 16, ECF No. 58).  In actuality, these are litigation driven statements with little substantive claim construction value.  They are also self-serving.  For example, ASI's brief states that "[t]hus, the patentee's statement in the reexamination that the 'recognized standard for measuring DOI is found in GM4348M p. 6 and Section 3.1.5' is consistent with and supports ASI's proposed definition."  (ASI Br. at 19, ECF No. 58).  ASI made this statement on February 5, 2016 (JX7, JA013615)—nearly 8 years after filing of the Asserted Patents and 1.5 years after it filed the original Complaint in this lawsuit.

ASI points to case law for the proposition of considering reexamination prosecution history for claim construction purposes.  (ASI Br. at 16-17, ECF No. 58).  This case law, however, relates to *estopping* the patentee; not *enabling* the patentee.  In short, these statements

---

[6] PolyOne and ASI are using a Joint Appendix ("JA") comprised of exhibits JX1 through JX9 and Bates numbered JA00001 through JA013885.  The JA includes the Asserted Patents, relevant related applications, file histories, and reexaminations.

are like admissions in that they can only be used against the patentee.  For example, ASI cites *Krippelz v. Ford Motor Co.*, 667 F.3d 1261 (Fed. Cir. 2012) and *Am. Piledriving Equip., Inc. v. Geoquip, Inc.,* 637 F.3d 1324, 1336 (Fed. Cir. 2011) for support.  (ASI Br. at 17, ECF No. 58).  These cases involve situations where the patentee's statements are used against it for disclaimer purposes.  In *Am. Piledriving Equip., Inc.* the patentee "unambiguously argued that 'integral' meant 'one-piece' during reexamination and cannot attempt to distance itself from the disavowal of broader claim scope." *Am. Piledriving Equip., Inc.*, 637 F.3d at 1336.  The same is true for *Krippelz* where the patentee made statements disclaiming his invention.  *Krippelz*, 667 F.3d at 1267.  Accordingly, while reexamination statements can be used for claim construction purposes, they cannot be used to reinterpret the claims as ASI wants.  *See also CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1159 (Fed. Cir. 1997) (Patentee's "proffered meaning of 'elasticity' is squarely at odds with the meaning of the term that emerges… reexamination histories").

PolyOne filed a motion to stay these proceedings pending reexamination in hopes that claim construction issues would be narrowed.  (ASI Br. at 17, ECF No. 58).  This is exactly what happened.  ASI narrowed its claims in statements during the Reexaminations by arguing that "passes" for the gravelometer test can mean obtaining a rating of **7 or greater**.  (JX7, JA013615, JA013619).  PolyOne agrees.  Accordingly, ASI's narrowing through the Reexamination eliminated a claim construction issue for this Court.

Statements made during reexaminations, however, cannot be used to broaden claim scope or fix specification deficiencies.  *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318–19 (Fed. Cir. 2006) (Court finding patentee statement made during reexamination could not be relied on for claim construction purposes); *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1556 (Fed. Cir. 1997) *abrogated by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d

1448 (Fed. Cir. 1998) ("To the extent that the examiner's [Reexamination] certificate purports to ascribe meaning not found in the claim language, this court must not permit prosecution history evidence to 'enlarge, diminish, or vary' the meaning of claim language.").

ASI also tries to hold the Reexaminations out as grounds that the patent office somehow "confirmed" patent validity.  (ASI Br. at 4-5, ECF No. 58; PX3, ECF No. 58-3). Reexaminations, however, are limited to the review of prior art—which is not even at issue in claim construction.  35 U.S.C. §§301-307.  Challenges, such as the indefinite claim constructions at issue here, cannot be raised during reexaminations.  *Id.*; *see also* MPEP § 2209.

In these U.S. Reexaminations, the Examiners for some unknown reason did not apply the combination of prior art that was offered by PolyOne.  In the related pending European Oppositions, however, the European Examiners recently orally ruled that they would revoke the related European patent claims for being indefinite.  (Michalek Resp. Decl., Ex. 18).[7]  PolyOne will provide the Court with a copy of the written opinion which is expected to be issued soon.

This European revocation is valuable in assisting this Court's analysis.  *Warner-Jenkinson Co. v. Allied Chem. Corp.*, 477 F. Supp. 371, 386–87 (S.D.N.Y. 1979), *aff'd,* 633 F.2d 208 (2d Cir. 1980) ("While the decisions of the two foreign patent offices 'are in no way controlling upon this court… [t]he opinions of such men, learned, able and disinterested, officially expressed after thorough examination, are persuasive to say the least.'") (internal citations and quotations omitted); *Caterpillar Tractor Co. v. Berco, S.P.A.*, 714 F.2d 1110, 1116 (Fed. Cir. 1983) ("… there is ample such authority in decisions of other courts and when such matters comprise relevant evidence they must be considered.").

---

[7] PolyOne submits additional Exhibits 18 through 20 supporting its claim construction position that are attached to the Response Declaration of Brian R. Michalek that is filed simultaneously herewith ("Michalek Resp. Decl.").

III.    **ASI's Gravelometer Arguments are Unworkable Because the Claimed Structures Do Not Have Paint to Chip Off**

ASI accuses PolyOne of altering the gravelometer rules (ASI Br. at 12, ECF No. 58), but no one even knows what those rules are.  ASI's construction ignores this reality and simply recites the language from the GM9508P paint standard while not addressing its unworkability to the claimed polyolefin structures (i.e. plastics).  With no explanation of how to apply GM9508P to plastics, the Gravelometer limitation is indefinite for failing to provide a claim scope with the required "reasonable certainty."  *See Nautilus Inc.*, 134 S.Ct. at 2124 (2014.

A.    **ASI's Proposed Gravelometer Construction Would Render the Claims Meaningless**

The GM9508P test is a paint test that cannot be applied to the claimed plastics. (Michalek Decl., Ex. 4, ECF No. 61-4 ("GM9508P"); *see also* PolyOne's Opening Claim Construction Brief at 6, ECF No. 59 (the "PolyOne Br.")).  ASI avoids this gap and simply proposes a construction with the paint language from the GM9508P standard.  (ASI Br. at 10-13, ECF No. 58.  This proffered construction is agnostic to the rest of the claimed limitations. Namely, it ignores that each asserted claims require a structure that has "polyolefin" layers (i.e. plastics).  (JX1-2).  And if you projected gravel at plastics per the GM9508P test, there would be considerable damage, but no paint to chip off.  (Michalek Decl., Ex. 3, Tr. 19:4-10, ECF No. 61-3; *See also* PolyOne Br. at 6, ECF No. 59).

ASI's brief highlights the unworkability of the GM9508P standard to plastics.  It states that the GM9508P evaluation procedure is to: "[p]ress the tape down firmly by rubbing, then pull off to remove any loose **chips or paints**."  (ASI Br. at 12, ECF No. 58) (emphasis added).  But for plastics, there would not be any loose **"chips or paints"** to remove—it would be a non-test.

ASI's interpretation-in-a-vacuum misses the mark.  "[P]roper claim construction ... demands interpretation of the entire claim in context, not a single element in isolation."

9

*Hockerson–Halberstadt, Inc. v. Converse Inc.,* 183 F.3d 1369, 1374 (Fed.Cir.1999).

Accordingly, the appropriate construction of the GM9508P limitation must also consider the rest

of the claim—namely the "polyolefin" limitations. *See Kyocera Wireless Corp. v. Int'l Trade*

*Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) ("However, this court does not interpret claim

terms in a vacuum, devoid of the context of the claim as a whole.").  The Asserted Patents do not

define what damage to consider in the context of each claim.  The Asserted Patents do not even

define what a "chip" is when talking about plastics. *See Cat Tech LLC v. TubeMaster, Inc.*, 528

F.3d 871, 885 (Fed. Cir. 2008) (Court rejecting claim construction that would render claim

limitation meaningless).

That is why ASI needed to reverse engineer its plastic Gravelometer construction.  When

it initially ran its plastic Gravelometer test that included marring, it received failing "2s" and "3s"

as detailed in its lab test report shown below:

(Michalek Decl., Ex. 11 (GPT000113), ECF No. 61-11).  When ASI learned of the failed scores, it rewrote the rules to *exclude marring* and to only consider some undefined *"chipping"* to raise the scores as shown above.  So it was actually ASI who "alter[ed] the rules for 'keeping score'" (*see* ASI Br. at 12, ECF No. 58) and not PolyOne.  This type of flip-flopping destroys any "reasonable certainty" to the claim scope rendering them invalid. *See Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1398 (Fed. Cir. 2016) (internal citations and quotations omitted) ("But a term of degree cannot be definite when construed in a manner that lends itself to this sort of scattershot infringement analysis because a term of degree fails to provide sufficient notice of its scope if it depends on the unpredictable vagaries of any one person's opinion.").  As seen above, without any guidance in the patents, ASI had to subjectively choose between two opinions for the degree of damage—2's and 3's versus 7's.

### B. ASI's Proposed Gravelometer Construction Does Not Explain What a "Chip" is for Plastics

ASI only wants to count what it calls "chips" for Gravelometer scoring.  (ASI Br. at 10, ECF No. 58).  A chip for paint is "a piece of paint that has come loose from a surface." (http://www.dictionary.com/browse/paint-chip).  But no one knows what a "chip" for plastic is. (ASI Br. at 10, ECF No. 58).  GM9508P provides no help since it is a paint standard.  (Michalek Decl., Ex. 4, ¶5.3.8, ECF No. 61-4) ("Press the tape down firmly by rubbing, then pull off to remove any loose chips or paints.").  The Asserted Patents provide no explanation.  And neither of ASI's experts addresses this issue.  Accordingly, an evaluator is left to give his own opinion on how a "chip" counts for plastics.

This is what happened when ASI engaged Mr. Doug Leggat, of Ghesquiere Plastic Testing, Inc. ("GPT"), to conduct its infringement testing.[8]  Mr. Leggat knew what a chip for paint was: "Q… What is chipping? A. Chipping is the removal of paint."  (Michalek Resp. Decl., Ex. 19, Tr. 40:15-16).  But for plastics, he did not:

> "A… You know, a paint will chip. You have clear chip, and you can see the substrate or the primer.  Plastics tend more to mar or just get displaced.  They don't chip like a paint would.  So by necessity, you have to evaluate them differently."  (Michalek Decl., Ex. 3, Tr. 19:4-10, ECF No. 61-3).

Accordingly, Mr. Leggat explained that in attempting to evaluate "chips" for plastics, he had to make some discretionary choices:

> "A…You have to somehow decide, all right, I'm going to include all marring as a chip, you know, as a, quote, chip, or it's only going to be when there's, in fact, a tear in the substrate or whatever. You have to come to sort of agreement with your customer about how you're going to evaluate things."  (Michalek Decl., Ex. 3, Tr. 19:10-16, ECF No. 61-3).

Even if an agreement with your customer is made, there is no way to "determine the degree of chipping **visual comparison** with the photographic standards…" as defined in GM9508P.  (Michalek Decl., Ex. 4, ¶6, ECF No. 61-4) (emphasis added).  Without any guidance, GPT came up with its own way of evaluating a plastic "chip" using magnification.  Magnification, however, is not part of the GM9508P standard and evaluating a plastic "chip" adds complexity as Mr. Leggat testified:

> Q. How did you go about doing it?
> A. Well, as I indicated, there were four of us that actually looked at all of these panels under magnification so that we could determine whether -- which of these little marks were, in fact, breaks in the surface and which were scuffs and mars. And as you can imagine just by looking at it, it's not easy to do with the naked eye. You do need some magnification. So we would do that, eliminate, to the best

---

[8] Mr. Leggat is a chemical engineer with a specialty in polymers who manages GPT and is skilled in Gravelometer testing.  (Michalek Resp. Decl., Ex. 19, Tr. 8-9).  He has been working at GPT for 33 years.  *Id.*  Mr. Leggat did not serve an expert report in this litigation.  His deposition, however, was taken on January 11, 2017, and ASI crossed examined him.  *Id.*

of our abilities and our mind, the mars and scuffs, focusing solely on the cuts, the
breaks, and anything through the film and then comparing them to the charts in
the test method.  (Michalek Resp. Decl., Ex. 19, Tr. 70:18-71:7).

Accordingly, it is not up to the Asserted Patents, any teaching in the industry, or even any of

ASI's experts.  But the scope of the claim would be determined by the "customer to decide":

> Q. So how do you determine which you include, marring or tearing or whatever?
> A. By consultation with the customer.
> Q. So it's up to the customer to decide?
> A. In this instance, it has to be because you're deviating, really, from the intent of
> the test method.  (Michalek Decl., Ex. 3, Tr. 19:17-24, ECF No. 61-3).

This is clearly runs afoul of any "reasonable certainty" that is required by *Nautilus*.

### C.     ASI's Proposed Gravelometer Construction Improperly Asserts "Common Sense" for Administering the Modified GM9508P Test

The asserted claims further tried to modify the GM9508P standard from using 1 pint of

gravel to using 10 pints.  But the Asserted Patents provide no instruction for how to do this

modification.  ASI asks us to rely on "common sense," but stops before explaining what that

common sense is.  (ASI Br. at 11, ECF No. 58).  The problem is that there are multiple "common

sense" methods for feeding 10 pints of gravel for a test only designed for 1 pint.  And each

method leads to different results.  (Menna Decl., Ex. A, ¶12m, ECF No. 63-1).  A gravelometer

operator may choose to feed all 10 pints of gravel at once, or he may choose to feed 1 pint of

gravel at a time.  (PolyOne Br. at 11-12, ECF No. 59).  This choice, however, may lead to

different temperature and pressure changes within the test system which in turn causes varying

gravelometer values.  (Menna Decl., Ex. A, p. 7, ¶12m, ECF No. 63-1).

ASI's expert, Dr. Baghdachi, does not help matters.  Instead, he simply declares that a

person of ordinary skill would figure out how to use 10 pints, but does not explain how to do so.

(PX 2, ¶14, ECF No. 58-2) ("In addition, a person of ordinary skill in the art would be able to run

the test using 10 pints of gravel instead of one pint and at a 30 degree angle.").  Should it be 10

pints at once or 1 pint administered 10 times?  Dr. Baghdachi does not even give a clue which to use.  This ambiguity rises to the exact type of "conclusory, *unsupported assertions* by experts as to the definition of a claim term are not useful to a court." *Aristocrat Techs. Austl. Pty Ltd.*, 709 F.3d at 1361 (citing *Phillips*, 415 F.3d at 1318) (emphasis added).

The final straw is ASI's acknowledgement that the GM9508P test has two distinct methods—Method A and Method B.  (ASI Br. at 11, ECF No. 58).  But neither the Asserted Patents nor ASI's brief explain which one to use.  Method A is a "*contained method* where the gravelometer is contained in a constant temperature freezer" and Method B is a "*transfer method* where test panels are transferred from a freezer to gravelometer at room temperature." (Michalek Decl., Ex. 4 at 1, ECF No. 61-4) (emphasis added).  Each method is performed at a different test temperature.  Method A's maximum test temperature of -18 °C.  But in Method B, the sample panel must be separately conditioned at -30 °C. *Id.,* p. 2.  The reason this matters is because use of these different methods can lead to different results.  (Menna Decl., Ex. A at 6, ECF No. 63-1).  For example, at lower temperatures (e.g. Method B), the sample is more brittle and there is an increased tendency to cause damage by gravel impact than on warmer sample (e.g. Method A).  *Id*.  Accordingly, each method will yield different results.  *Dow Chem. Co. v. Nova Chem. Corp. (Can.)*, 803 F.3d 620, 633-634 (Fed. Cir. 2015).

Given that nothing in the Asserted Patents explains how to conduct the modified GM9508P test or which methods to use, the Gravelometer limitation is indefinite.

### D.    To the Extent the Gravelometer Limitation Can Be Construed, All Damage Should Be Counted

ASI's failure to define what GM9508P damage should count for plastics renders the asserted claims indefinite.  To the extent the Gravelometer limitation can be construed, however,

14

all damage should be included.[9]  As illustrated below, the gravelometer causes significant

damage to the products at issue (Michalek Decl., Ex. 7, ECF No. 61-7 below):



Accordingly, PolyOne's position is that either the claims do not say _what damage_ should

count, i.e. the claims are indefinite, or that _all damage_ should be count.  ASI, however, asks the

Court to draw a difficult line for what damage is in and what is out.  ASI's reasoning is undercut

by its own brief that noted "[a]chieving a balance of excellent optical qualities and excellent

durability qualities [was] a difficult endeavor."  (ASI Br. at 2, ECF No. 58).  Similarly, the

invention sought to obtain a "Class A" finish.  (JX1, JA000001, Abstract).  Yet, ASI now tries to

exclude categories of damage that would lessen those excellent "optical" or "durability" qualities

and Class A finish.  Specifically, ASI tries to carve out "marring."  (ASI Br. at 12-13, ECF No.

---

[9] PolyOne's substitute Gravelometer construction includes all damage: "chipping, denting, cratering, cracking, marring, or other surface damage of any kind imparted by the gravel to the surface."  (PolyOne Br. at 12, ECF No. 59).

58).  Its reasoning is that there already is a separate GM standard for marring.  *Id*.  This standard, however, is for a completely different type of test and is not part of the asserted claims.

The GMN3943 test is not an impact test, but a scratch test.  It is used to identify scratch marks caused by the testing device that drags a claw with five movable arms with metal tips across the plastic.  Think of fingernails on a chalkboard.  The GMN3943 scratch test inflicts a different type of damage than the GM9508P gravel test.  The "marring" caused by the scratching of the GMN3943 test is different from any "marring" caused by the impacts from the GM9805P gravelometer test.

ASI's proposed carve out would not solve the claim construction issues.  It would simply arbitrarily draw a line on a particular type of damage that is not included.  But "marring" is just one type of damage that would not be counted in PolyOne's substitute construction.  Other types of damage such as "denting," "cratering," and "cracking" (types of damage that do not have their own standards) would still need to be addressed.

ASI may attempt to muddy the waters between marring and chipping by citing to its cross-examination of Mr. Leggat.  However, as Mr. Leggat made clear in this line of question, he was talking about paint chipping when asked about marring.

> Q. Does the GM standard GM9508P, which is Exhibit 3, refer to marring?
> A. No. This says, describes the test procedures to evaluate the chip resistance of coatings.  (Michalek Decl., Ex. 3, Tr. 82:20-24, ECF No. 61-3).

There is simply no logic to draw a line of what damage to include so the claim is either indefinite or all damage should be counted in the analysis.

## IV.     ASI's DOI Construction Improperly Redrafts the Asserted Patents

Each asserted claim requires that "[the structure] has a DOI of 70 or greater."  (JX1, JA000019-20).  The Asserted Patents, however, do not tell which of the different DOI methods and test instruments to use.  Realizing this deficiency, ASI tries to force the GM4348M standard.

The GM4348M standard, however, is not in the claims, specification or prosecution history of the Asserted Patents. *See Dow Chem. Co.,* 803 F.3d at 630 ("the patent and prosecution history must disclose a single known approach or establish that, where multiple known approaches exist, a person having ordinary skill in the art would know which approach to select… Particularly this is so where different approaches to measurement are involved.").  And ASI's experts give no reason why the GM4348M standard should be used instead of other alternatives that were available at the time.  With no guidance on how to test DOI, the claims must be considered indefinite.  *Id.,* at 634 ("whether the existence of multiple methods leading to different results without guidance in the patent or the prosecution history as to which method should be used renders the claims indefinite….").

### A.     The GM4348M Standard is Not Intrinsic Evidence

ASI claims that "[b]oth GM9508P and GM4348M are intrinsic evidence because they are cited in the reexamination prosecution histories."  (ASI Br. at 16, ECF No. 58).  Not so.  The GM4348M standard is not referenced in the patent claims, specification, or prosecution history.  Nevertheless, ASI engages in a series of acrobatics to force it into the patents.  ASI posits a theory where the specification references the GM9508P standard; which in turn "references" GM4348M; which therefore transforms the GM4348M standard into "intrinsic" evidence.  (ASI Br. at 16, ECF No. 58).  This layered contortion has no value.

More telling is that the patents specifically exclude the GM4348M standard because they reference several other standards.  Included among these are General Motors standards GM9302P (4:37); GM3943 (12:20); GM9533P, GM9509P, GM9904P, and GMP E/P 148.  (JX1, JA000016-17, Table 2).  But GM4348M is not one of them.  Had the inventor intended GM4348M to be part of the invention, he would have included it in the patent as he did with all the others.  Doing so now, after-the-fact, amounts to an improper redrafting of the claims.

17

ASI tries to make GM4348M "intrinsic" by reference to the Reexaminations.  (ASI Br. at 16, ECF No. 58).  On February 5, 2016, ASI stated that: [a] recognized standard for measuring DOI is found in GM4348M, p. 6 and Section 3.1.5…"  (ASI Br. at 19, ECF No. 58; JX7, JA013615).  Not only is this statement 7 years too late and after the start of this litigation, it is a self-serving attempt to use the Reexaminations to backfill the patents' deficiencies.  When an issued patent is invalid, however, a reexamination without any amendment will not cure the defect.

Interestingly enough, ASI argues that the DOI limitation is not invalid under 35 USC § 112 because USPTO examiners "have the responsibility of examining proposed patent claims for compliance with 35 USC §112," and that the Examiner for the Asserted Patents did not reject the DOI limitation on § 112 grounds.  (ASI Br. at 16-17, ECF No. 58).  The § 112 indefiniteness analysis, however, has changed since the Asserted Patents issued in 2011.  During prosecution of the Asserted Patents, Patent Examiners only could reject claims on indefiniteness grounds if the claim was "insolubly ambiguous."  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) *abrogated by Nautilus, Inc.*, 134 S. Ct. 2120.  In 2014, the Supreme Court flipped the indefiniteness analysis in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120 (2014) to actively require patent claims to inform those skilled in the art of the scope of the invention with a "reasonable certainty."  134 S.Ct. at 2124.  This places a more stringent obligation on the patentee to distinctly claim the invention.

Today, under the more exacting "reasonable certainty" indefiniteness standard, the Patent Examiner in a related child application No. 15/005,119 ("the '119 application") has rejected the exact same DOI limitation at issue here for being indefinite.  The Examiner's reasoning under *Nautilus's* "reasonable certainty" test was the same as PolyOne's: "… given that DOI, like gloss,

18

is a relative property based upon the method of measuring the DOI, the recitation of DOI without reciting the conditions under which the property is measured renders the claims indefinite."[10] (Michalek Decl., Ex. 1 at 11, ECF No. 61-3).  Accordingly, as the Examiner indicates, the Asserted Patents' DOI limitation is invalid.  *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (holding that statements made in prosecution of one patent are relevant to the scope of all sibling patents).

### B.    The GM4348M Standard is Not Related to a Gravelometer Test

ASI claims that the GM4348M standard was essential in conducting the GM9508P paint test because the GM9508P stated: "Method A must be used for material validation of exterior body coatings applied to zones A, B, or C as specified in GM4348M."  (ASI Br. at 15, ECF No. 58).  As detailed *supra*, the Asserted Patents are indefinite because they do not explain whether to use Method A or Method B of the GM9508P standard.

Nevertheless, knowledge of GM4348M's existence is not the same as it being part of the invention.  And even so, only Method A references GM4348M.  Method B—the method that ASI used in conducting its infringement test—does not.  So a technician performing a Method B test would never even refer to GM4348M.

Finally, the GM9508P's "reference" to the GM4348M standard has nothing even to do with DOI.  Instead, it references Table 1 of the GM4348M standard entitled "Appearance Zone Descriptions" that sets forth the different descriptions the various appearance zones.  (Michalek Decl., Ex. 4 at Table 1, ECF No. 61-4).

Again, ASI's expert Dr. Baghdachi is of little help.  He just declares: "Based on my experience, a POSA would look to GM4348M to determine the instruments to use to measure

---

[10] On February 8, 2017, ASI filed an Office Action reply that mirrors almost verbatim its arguments presented in its brief.  (Michalek Resp. Decl., Ex. 20 at 22-23).  No amendment could be made to cure the indefiniteness rejection.  The Examiner has not yet responded.

DOI in order to qualify a part for GM."  (PX 2 at ¶12, ECF No. 58-2).  But the GM4348M

standard applies to paint and not plastic parts as explained by Douglas Leggat of Ghesquiere

Plastics Testing, Inc.:

> Q. You said it [GM4348M] really doesn't apply. You mean really doesn't apply to
> TPO?
> A. Correct. There was no TPO standard for such an application. So since they're
> using this material to replace painted steel, they use the painted steel standard to
> generate some numbers.
> Q. Is there any standard for TPO DOI today?
> A. Not to my knowledge.  (Michalek Resp. Decl., Ex. 19, Tr. 49:2-24).

Accordingly, ASI's multiple layered incorporation by reference theory has no value.

### C.    The GM4348M Standard Was Never Identified As Prior Art

ASI claims that a person of ordinary skill in the art would have considered GM4348M as

prior art.  (ASI Br. at 16, ECF No. 58).  This argument goes nowhere.  Indeed, ASI never even

cited the GM4348M standard in any of its information disclosure statements that it filed during

prosecution of the '902 and the '906 patents.  *See Ekchian v. Home Depot, Inc.*, 104 F.3d 1299,

1303 (Fed. Cir. 1997) ("An IDS is part of the prosecution history on which the examiner, the

courts, and the public are entitled to rely."); *Pall Corp. v. PTI Techs. Inc.*, 259 F.3d 1383, 1392

(Fed. Cir. 2001), *cert. granted, judgment vacated sub nom. PTI Techs., Inc. v. Pall Corp. Techs.*,

535 U.S. 1109, 122 S. Ct. 2324, 153 L. Ed. 2d 152 (2002) ("Statements made during prosecution

that may be used in claim construction include statements that accompany an Information

Disclosure Statement.").

### V.    ASI's Random Microstructure Construction Relies Entirely on Unreliable Extrinsic Reference

ASI's "random microstructure" argument is again another after-the-fact redraft.  ASI cites

to conclusions in the specification:

> "Examples of 'random isotactic polyolefins' are listed in col. 7, lines 37-52 and
> col. 9, line 59 through col. 10, line 5. In addition, claim 32, which is a dependent

claim, recites, '[t]he formed product of claim 29 wherein the polypropylene/ethylene copolymers of the clear and color layers are random copolymers.'"  (ASI Br. at 20, ECF No. 58).

ASI's brief goes on to cherry-pick more from the specification: "the thermoplastic polyolefin is preferably of a random microstructure, and may be exclusive of block copolymers."  (ASI Br. at 20, ECF No. 58).  These conclusions provide no explanation of the "random microstructure" limitation and certainly no support for ASI's labored construction.

Without support in the specification, ASI turns to extrinsic references.  (ASI Br. at 20, ECF No. 58).  This evidence, however, does not help.  For example, the referred to '622 publication entitled "Composition including multiple functionalized polymers" explains the varying degrees of randomness for microstructure.  The '622 publication states:

> In solution polymerizations, both **randomization of the mer units and vinyl content (i.e., 1,2-microstructure) can be increased through inclusion of a coordinator, usually a polar compound, in the polymerization ingredients**. Up to 90 or more equivalents of coordinator can be used per equivalent of initiator, with the amount depending on, e.g., the amount of vinyl content desired, the level of non-polyene monomer employed, the reaction temperature, and the nature of the specific coordinator employed.  ('622 publication, ¶ 34) (emphasis added).

This is the exact problem PolyOne explained in its opening brief, i.e. that polymer randomness can increase or decrease depending on many factors:

> "The polymer science adds confusion to this limitation as all polymers have some degree of randomness… Accordingly, there is no teaching from the Asserted Patents that would help distinguish a polyolefin layer with a random microstructure from a polyolefin layer with a non-random microstructure." (PolyOne Br. at 22, ECF No. 59).

But with no explanation in the Asserted Patents, we are left only to guess what that degree of randomness is.[11]  *See Regeneron Pharms., Inc. v. Merus B.V.*, No. 14 CIV. 1650 KBF, 2014 WL

---

[11] ASI also cites "Block Index for Characterizing Olefin Block Copolymers" but has neither produced this or otherwise made available this document to PolyOne or the Court.

6611510, at *24 (S.D.N.Y. Nov. 21, 2014) (Court finding claim term "endogenous mouse immunoglobulin locus" as indefinite under *Nautilus* because "[t]he specification never uses the term 'endogenous mouse immunoglobulin locus' and never informs the reader how to find the immunoglobulin locus.  As such, "[o]ne would have had to guess and be lucky to get it right," and thus "the 'reasonable certainty' required by the Supreme Court [in *Nautilus*] is lacking.").

ASI's brief also relies on its expert Dr. Coughlin.  (ASI Br. at 20, ECF No. 58).  As detailed above, however, Dr. Coughlin just concludes and does not analyze.  And while Dr. Coughlin cites to the '622 publication, he does not explain how the "random microstructure" for rubber tires (e.g. the '622 patent) is the same random microstructure for TPO products (e.g. the Asserted Patents).  Even more problematic is that ASI's brief cites to "Coughlin Decl. ¶ 12 citing U.S. Patent No. 9,133,290."  (ASI Br. at 20, ECF No. 58).  Dr. Coughlin, however, makes no analysis of U.S. 9,133,290, either in paragraph 12 of his declaration or anywhere.  Accordingly, Dr. Coughlin's declaration simply amounts to unsupported conclusion.

Like the DOI limitation, the Patent Examiner in the pending '119 application no. 15/005,119 has rejected the exact same "random microstructure" limitation on grounds of indefiniteness under 35 U.S.C. § 112, ¶2:

> "Claim 19 recites the limitation 'wherein the thermoplastic polyolefin of the second polymeric layer has a random microstructure' however it is unclear as to what is meant by the term 'random microstructure' given that the specification does not clearly define what 'microstructure' is random nor what degree of order or randomness would meet the limitation for which the 'microstructure' is random."[12]  (Michalek Decl., Ex. 1, p. 13, ¶14, ECF No. 61-1).

Accordingly, the random microstructure claim limitation is indefinite.

---

[12] As above, ASI filed an Office Action reply on February 8, 2017, that closely mirrors its arguments presented in its brief.  (Michalek Resp. Decl., Ex. 20 at 25).  The Examiner has not responded.

**VI.    ASI's Colored and Clear Constructions Result in an Impermissible Overlap**

| Patent Claims | PolyOne's Construction | ASI's Construction |
|---|---|---|
| Clear Polyolefin Layer | a polyolefin layer **having no pigment of any amount** and having a light transmittance of 85% or greater and a haze of 10 or less [emphasis added] | A POSA would understand that a "clear polyolefin layer has a light transmittance of 85% or greater, a haze of 10 or less." |
| Colored Polyolefin Layer | a polyolefin layer having any amount of pigment present | having color, which may be supplied by a pigment, a dye or otherwise." |

ASI's "clear polyolefin layer" and "color polyolefin layer" constructions overlap.  ASI argues that "[f]or certain applications, it may be desirable to include a small amount of pigment or special effects in the clear layer."  (ASI Br. at 21, ECF No. 58; JX1, JA00008, col. 5, ll. 38-44).  But if any pigment or special effects were added, no matter how small, the "clear polyolefin layer" turns into the "colored polyolefin layer."

The only difference between the parties' construction for "clear polyolefin layer" is that PolyOne's interpretation includes "having no pigment of any amount."  Not only is this required to prevent the "clear" and "colored" terms from overlapping, but this construction is consistent with Examples 1 through 6 in the specification where the clear layer has no pigment.  (JX1, JA000013-15).

As ASI notes, the specification states that "[f]or certain applications it may be desirable to include a small amount of pigment or special effects in the clear layer 3."  (ASI Br. at 21, ECF No. 58; JX1, JA000008, col. 5, ll. 42-44).  This may be appropriate for certain embodiments where the claims do not require both a "clear" and a "color" layer.  For example, claim 55 of the '906 patent only requires "a polyolefin layer" and a "thermoplastic polyolefin backing layer."

(JX2, JA000040, col. 29, ll. 44-53).  In this embodiment, what is otherwise called the top or a clear layer may have some pigment to become the claimed "polyolefin layer."

PolyOne's construction is also consistent with the portion of the patent specification referring to the "translucent color layer."  This is essentially a clear layer that actually does have color:

> "The translucent color layer 29, 39 does not require that only translucent pigments are used therein. In this case, "translucent" is meant to refer to the percent loading of color used in the translucent layer 29, 39. All pigments used in the color layer 25, 35 can also be used in the translucent layer 29, 39, but are used in lower amounts (relative to the underlying essentially opaque color layer 25, 35) in order to maintain some level of the base resin clarity."  (JX1, JA00010, col 10, ll. 15-23).

Finally, ASI's reliance on Dr. Coughlin is once again unreliable as his analysis of the "clear" and "colored" layer terms is no analysis at all; just conclusions.  (PX1 at ¶¶13-14, ECF No. 58-1).

Accordingly, to prevent "clear polyolefin" layer from becoming one with the "colored polyolefin layer," as those terms are used in the claims, it must be construed as having "no pigment of any amount."

## VII.    Conclusion

The *Nautilus* indefiniteness standard is not merely overcome because "a court can ascribe some meaning to a patent's claims."  *Interval Licensing LLC*, 766 F.3d at 1371 (Fed. Cir. 2014) (*quoting Nautilus*, 134 S. Ct. at 2130).  More is required in that "[t]he claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Id*. (*citing Nautilus*, 134 S. Ct. at 2130 & n.8).  Here, there is nothing to provide those objective boundaries.  Instead, the Gravelometer limitation changes scope based on the type of damage that the evaluator is told to consider.  And the DOI limitation fluctuates depending on the methodologies and instruments that are used.  For these reasons and other reasons discussed, the Asserted Patents are invalid.

24

Dated:  March 9, 2017                            Respectfully submitted,


                                                 ___/s/   Arne M. Olson_____
                                                 Arne M. Olson (admitted *Pro Hac Vice*)
                                                 Robert J. Ross (admitted *Pro Hac Vice*)
                                                 Brian R. Michalek (admitted *Pro Hac Vice*)
                                                 OLSON & CEPURITIS, LTD
                                                 20 N. Wacker Dr., Fl. 36
                                                 Chicago, IL 60606
                                                 (312) 580-1180
                                                 (312) 580-1189 (fax)
                                                 aolson@olsonip.com
                                                 rross@olsonip.com
                                                 bmichalek@olsonip.com


                                                 Kip T. Bollin              (0065275)
                                                 THOMPSON HINE LLP
                                                 3900 Key Center
                                                 127 Public Square
                                                 Cleveland, OH  44114-1291
                                                 (216) 566-5500
                                                 (216) 566-5800 (fax)
                                                 Kip.Bollin@ThompsonHine.com


                                                 Attorneys for Defendants and Counter-Plaintiffs
                                                 PolyOne Corporation and PolyOne Designed
                                                 Structures and Solutions LLC

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the forgoing document was served on March 9, 2017 upon the following counsel of record in the manner listed:

<u>VIA ECF</u>
Mark Skakun, Esq.
Buckingham, Doolittle & Burroughs, LLC
4518 Fulton Drive NW, Suite 200
Canton, OH 44735-5548
mskakun@bdblaw.com

Eric C. Cohen, Esq.
Mark H. Remus, Esq.
Oluwafemi L. Masha, Esq.
Jon H. Beaupre, Esq.
BRINKS GILSON & LIONE
NBC Tower - Suite 3600
455 N. Cityfront Plaza Drive
Chicago, Illinois 60611
eccohen@brinksgilson.com
mremus@brinksgilson.com
omasha@brinksgilson.com
jbeaupre@brinksgilson.com


_____/s/____Arne M. Olson_____
One of the Attorneys for Defendants and
Counter-Plaintiffs POLYONE CORPORATION
and POLYONE DESIGNED STRUCTURES AND
SOLUTIONS LLC